EDMOND BROWN,

     Plaintiff,

v.

HADDON TOWNSHIP, POLICE CHIEF
MARK CAVALLO, in his official
capacity, and POLICE OFFICER
ROBERT MULHERN, in his
individual and official
capacity,

     Defendants.

1:18-cv-15122-NLH-AMD

**OPINION**

**APPEARANCES:**

CONRAD J. BENEDETTO
THE LAW OFFICES OF CONRAD J. BENEDETTO
1615 S. BROAD STREET
PHILADELPHIA, PA 19148

HILLARY MARA NAPPI
FRANK ROCCO SCHIRRIPA
HACH ROSE SCHIRRIPA & CHEVERIE LLP
112 MADISON AVE
10TH FL
NEW YORK, NY 10016

    *On behalf of Plaintiff*

TIMOTHY R. BIEG
MADDEN & MADDEN
108 KINGS HIGHWAY EAST, SUITE 200
P.O. BOX 210
HADDONFIELD, NJ 08033-0389

    *On behalf of Defendants*

**HILLMAN**, District Judge

This matter involves claims of excessive force and state torts allegedly committed by a Haddon Township police officer, and claims of municipal liability against Haddon Township and its chief of police for inappropriate training and supervision of the officer.  Presently before the Court is Defendants' motion for summary judgment.  Defendants' motion will be denied.

## BACKGROUND[1]

On October 29, 2016,[2] Plaintiff, Edmond Brown, was driving a Ford F-150 pick-up truck northbound on Route 130 when Defendant Haddon Township Police Officer Robert Mulhern observed a hanging handicap parking placard obstructing Plaintiff's view.  Mulhern turned on his lights and drove behind Plaintiff who continued driving for about a quarter mile despite several opportunities to turn off the highway.  When Plaintiff approached an intersection, Plaintiff crossed over a lane of traffic and then over a low median demarking a left turn lane, where he stopped

---

[1] The Court sets forth the following background from the police vehicle dashcam video which captured the entire incident that gives rise to this action.

[2] The complaint states that the incident occurred on October 26, 2016.  (Docket No. 1 at 1.)  The documents provided in the parties' submissions confirm that the date of the incident is October 29, 2016.

behind another car waiting at the red light.  Mulhern followed Plaintiff, exited his patrol car, approached Plaintiff, and directed Plaintiff to turn left and pull over on Alabama Road, which was a narrow residential street.  Plaintiff complied.

Mulhern approached Plaintiff's driver's side window and asked Plaintiff for his license, insurance, and registration. Mulhern stated that he pulled over Plaintiff because he was not permitted to drive with the handicap parking placard hanging from the rear view mirror.  Plaintiff related that he was borrowing the truck, he did not know the location of the insurance card, and he forgot his driver's license.  Mulhern asked Plaintiff for his name, date of birth, social security number, and address which he wrote down on a pad.  Plaintiff stated that his name was "Alhakeem Reid," he was born on July 31, 1979, and provided 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 as his social security number.  Mulhern asked Plaintiff to continue searching for the insurance card and to hold it out the window if he found it. Mulhern returned to his patrol car and provided the information given by Plaintiff to dispatch personnel.

When Plaintiff displayed an insurance card out of the window, Mulhern exited his patrol car and went to the driver's side of Plaintiff's truck.  Mulhern examined it and noted that the insurance was outdated, and asked Plaintiff to try to locate

a current one.  Mulhern returned to his patrol car and the
dispatch officer informed him that an "Alhakeem Reid" with a
Camden, New Jersey address came up, but with a different date of
birth and a different social security number.

Mulhern went back to Plaintiff's vehicle.  Mulhern asked
Plaintiff if he had a valid New Jersey driver's license, despite
not having it with him, and Plaintiff said yes.  Mulhern asked
Plaintiff to again relate his date of birth and social security
number.  Plaintiff provided the same information, but when
Mulhern asked Plaintiff how old he was, Plaintiff stumbled and
could not provide an answer, saying he "just got up."  Mulhern
responded that at any time of day a person should know his date
of birth, social security number, and how old he is.  Mulhern
stated that Plaintiff was stalling, and Plaintiff needed to tell
Mulhern the truth because the information Plaintiff provided him
"did not come up."  Plaintiff insisted he was telling the truth,
and stated that his name had a dash - "Al-Hakeem Reid."  Mulhern
asked Plaintiff why he did not provide his name with the dash
when he saw Mulhern writing it down, and Mulhern continued to
question the veracity of Plaintiff's information.  Plaintiff
insisted he was being truthful.

While standing at Plaintiff's window, Mulhern called
dispatch from his radio and asked them to perform a driver's

license search with the same information as before but with
Plaintiff's name with a dash – "Al-Hakeem Reid." Dispatch
related that the name and date of birth did not come up.
Mulhern asked Plaintiff if he "wrote something else down" at the
DMV, and he told Plaintiff that never in his career had someone
told him their information and nothing had come back on file.
Mulhern told Plaintiff that he had "to work with" him. Mulhern
asked Plaintiff if he had anything with his name on it, and when
Plaintiff answered "no," Mulhern stated that he could not just
let Plaintiff go. Mulhern stated if Plaintiff told him the
truth, it would be "quick and easy" and Plaintiff would be on
his way, but if not, Mulhern would have to bring Plaintiff to
the station, fingerprint him, and wait for the response, which
Mulhern stated was "ridiculous."

Plaintiff insisted he was telling the truth, Mulhern
confirmed with Plaintiff again the information he provided, and
Mulhern asked for Plaintiff's address, which he stated was 1121
12th Street. Mulhern asked Plaintiff if he had ever been
arrested, locked up, or issued a ticket, and Plaintiff responded
no. Mulhern stated that they were going to "figure out what was
going on" and asked Plaintiff to "shut the car off." Until this
point, it had been about twenty minutes since Mulhern initiated
his stop of Plaintiff.

Mulhern, who had been leaning on the window ledge, took a small step back.  At that moment, instead of shutting off the engine, Plaintiff put the truck into drive and sped forward.  Mulhern jumped up and appears to jump into the driver's side window perhaps in an attempt to control the vehicle or shut off the ignition himself.[3]  He dangles from the window, holds the window ledge for a second as Plaintiff sped across the street.  At the last second, Mulhern jumps off the vehicle just before the truck collides violently with a car parked on the other side of the road.

Mulhern immediately pulled out his gun and yelled at Plaintiff multiple times, "Get the fuck out, Get the fuck down!"  Mulhern also called for back-up.  Plaintiff exited the truck, and Mulhern yelled for Plaintiff to get onto the ground and put his hands where he could see them.  Plaintiff went to the ground and raised his hands, then kneeled with his hands up, eventually leaning with his hands up against the bed of the truck.  At this point, Mulhern had his gun in his left hand, and Mulhern put his right hand on Plaintiff's shoulder in an attempt to wrestle Plaintiff to the ground while continuously ordering Plaintiff to get down.  Plaintiff, however, spun out of Mulhern's grip and

---

[3] The dashcam video does not capture where Mulhern places his hands in the truck.

started to run across the street toward where he had previously stopped. Mulhern chased after Plaintiff, grabbing with his right hand at Plaintiff's unzipped sweatshirt from behind, his firearm still in his left hand, and tried to stop Plaintiff, who continued running.

The pair ran behind a passing car, which had happened upon the unfolding scene and stopped in the road in the middle of the melee, and toward Mulhern's patrol car and into full view of the dashcam. Mulhern continued his effort to corral Plaintiff, his right hand tugging at the sweatshirt and his left arm extended around his waist in an apparent attempt to slow Plaintiff's attempted escape. At this point Mulhern still held his firearm in this left hand at approximately the center of Plaintiff's waistline angled down slightly and toward the stopped civilian car. As Mulhern continues to attempt to restrain Plaintiff, the firearm can be heard being discharged although neither Mulhern nor Plaintiff have a discernable reaction to the fired shot. Plaintiff soon spins face down on the lawn next to the curb, however, and after getting on Plaintiff's back, Mulhern eventually restrains and cuffs him.

At this point, back-up officers arrived. When Mulhern turned Plaintiff over into a seated position, Plaintiff stated "my leg, you shot me." Mulhern stated, "Are you shot?" and

7

questioned whether Plaintiff was actually shot and where he was shot. Plaintiff related that he heard Mulhern's gun go off during their struggle.[4] The officers put on gloves, located the bullet wound, and called for an ambulance. Plaintiff was transported to Cooper Hospital, where he was treated for an entry and exit wound to his upper thigh.

Based on the foregoing incident, Plaintiff claims that Mulhern violated his rights under the Fourth Amendment and the New Jersey Civil Rights Act by using excessive force. Plaintiff also claims that Haddon Township violated his constitutional and NJCRA rights for its inadequate training and supervision of Mulhern. Plaintiff claims that Mulhern, Haddon Township, and Police Chief Mark Cavallo also committed the state law torts of assault and battery, negligence, and gross negligence.

Defendants have moved for summary judgment on all of Plaintiff's claims. Mulhern argues that his actions do not constitute excessive force, and he is entitled to qualified immunity. Haddon Township and Police Chief Mark Cavallo reject Plaintiff's municipal liability claims. Defendants further argue that Plaintiff's state law claims fail on the same bases as Plaintiff's constitutional claims, and because Plaintiff's

---

[4] As discussed below, Mulhern later testified that Plaintiff had attempted to grab Mulhern's gun.

injuries do not meet the proper tort threshold.  Plaintiff has
opposed Defendants' motion in all respects.

## DISCUSSION

### A.    Subject Matter Jurisdiction

Plaintiff has brought his claims pursuant to 42 U.S.C. §
1983 and New Jersey state law.  This Court has jurisdiction over
Plaintiff's federal claims under 28 U.S.C. § 1331, and
supplemental jurisdiction of Plaintiff's state law claims under
28 U.S.C. § 1367.

### B.    Summary Judgment Standard

Summary judgment is appropriate where the Court is satisfied
that the materials in the record, including depositions,
documents, electronically stored information, affidavits or
declarations, stipulations, admissions, or interrogatory answers,
demonstrate that there is no genuine issue as to any material fact
and that the moving party is entitled to a judgment as a matter of
law.  Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R.
Civ. P. 56(a).

An issue is "genuine" if it is supported by evidence such
that a reasonable jury could return a verdict in the nonmoving
party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248 (1986).  A fact is "material" if, under the governing

substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

**C.  Analysis**

    **1.  Plaintiff's § 1983 & NJCRA claims[5]**

Section 1983 is not a source of substantive rights, but provides a vehicle for vindicating the violation of other federal rights.  <u>Graham v. Connor</u>, 490 U.S. 386, 393-94 (1989). Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  To state a claim for relief under § 1983, a plaintiff must allege the violation of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed or caused by a person acting under

---

[5] Like § 1983, the New Jersey Civil Rights Act, N.J.S.A. 10:6-2, et seq. (NJCRA), is a means of vindicating substantive rights and is not a source of rights itself.  <u>Gormley v. Wood-El</u>, 93 A.3d 344, 358 (N.J. 2014).  Because the NJCRA was modeled after § 1983, and creates a private cause of action for violations of civil rights secured under either the United States or New Jersey Constitutions, the NJCRA is interpreted analogously to § 1983.  <u>See</u> <u>Norman v. Haddon Township</u>, 2017 WL 2812876, at *4 (D.N.J. 2017).  Thus, Plaintiff's NJCRA violation claims will proceed or fail for the same reasons as Plaintiff's § 1983 claims.

color of state law.  West v. Atkins, 487 U.S. 42, 48 (1988);

Piecknick v. Pennsylvania, 36 F.3d 1250, 1255-56 (3d Cir. 1994).

For Plaintiff's claims against Mulhern in his personal
capacity, the qualified immunity doctrine governs the analysis.
"Qualified immunity shields government officials from civil
damages liability unless the official violated a statutory or
constitutional right that was clearly established at the time of
the challenged conduct."  Reichle v. Howards, 566 U.S. 658, 132
S. Ct. 2088, 2093 (2012).  In order to determine whether a
government official is entitled to qualified immunity, two
questions are to be asked: (1) has the plaintiff alleged or
shown a violation of a constitutional right, and (2) is the
right at issue "clearly established" at the time of the
defendant's alleged misconduct?  Pearson v. Callahan, 555 U.S.
223, 236 (2009).  Courts are "permitted to exercise their sound
discretion in deciding which of the two prongs of the qualified
immunity analysis should be addressed first."  Id.  It is the
defendant's burden to establish entitlement to qualified
immunity.  Kopec v. Tate, 361 F.3d 772 (3d Cir. 2004).

> ### a.  Plaintiff's excessive force claims against Mulhern

In determining whether excessive force was used in
effecting an arrest, the Fourth Amendment's "objective

12

reasonableness" test is applied.  <u>Sharrar v. Felsing</u>, 128 F.3d
810, 820-21 (3d Cir. 1997) (citing <u>Graham v. Connor</u>, 490 U.S.
386, 396 (1989)).  The objective reasonableness test "requires
careful attention to the facts and circumstances of each
particular case, including the severity of the crime at issue,
whether the suspect poses an immediate threat to the safety of
the officers or others, and whether he is actively resisting
arrest or attempting to evade arrest by flight."  <u>Id.</u> (relying
on <u>Graham</u>, 490 U.S. at 396; <u>Groman v. Township of Manalapan</u>, 47
F.3d 628, 634 (3d Cir. 1995)).  "Other relevant factors include
the possibility that the persons subject to the police action
are themselves violent or dangerous, the duration of the action,
whether the action takes place in the context of effecting an
arrest, the possibility that the suspect may be armed, and the
number of persons with whom the police officers must contend at
one time."  <u>Id.</u>

Even though the determination of whether an officer acted
in an objectively reasonable manner or made a reasonable mistake
of law, and is thus entitled to qualified immunity, is a
question of law that is properly answered by the court, not a
jury, the Third Circuit has recognized that a judge should not
decide the objective reasonableness issue until all the material
historical facts are no longer in dispute.  <u>Curley v. Klem</u>, 499

13

F.3d 199, 211, 211 n.12 (3d Cir. 2007). To do this, "[a] judge may use special jury interrogatories, for instance, to permit the jury to resolve the disputed facts upon which the court can then determine, as a matter of law, the ultimate question of qualified immunity." Id. In other words, "[w]hen the ultimate question of the objective reasonableness of an officer's behavior involves tightly intertwined issues of fact and law, it may be permissible to utilize a jury in an advisory capacity, . . . but responsibility for answering that ultimate question remains with the court." Id.

In this case, the Court must deny summary judgment and employ the special interrogatory procedure for the jury to resolve the disputed facts regarding Plaintiff's excessive force claim against Mulhern. Plaintiff contends that Mulhern acted unreasonably because Mulhern improperly escalated a routine traffic stop into a violent shooting. Mulhern contends that it was Plaintiff's actions that escalated a routine traffic stop and Mulhern's subsequent use of force was necessary and reasonable under the circumstances. While the dashcam video captured almost every moment of the incident at issue, Plaintiff and Mulhern have each presented their recitation of what occurred, which views differ from each other, and may differ from or add additional details to what is depicted in the video.

14

As a result, a jury must consider all of the evidence to flesh out the facts of what actually occurred before the Court may make a determination as to the reasonableness of Mulhern's actions, and as to the "clearly established" prong of the qualified immunity analysis.

The following are several examples of disputed facts that require a jury's resolution, although there may be many other facts requiring a jury's consideration:[6]

1. When Plaintiff suddenly accelerated instead of turning off the engine as Mulhern requested, a jury must determine whether, when Mulhern jumped onto the truck's open window, he (a) did so for his own safety, (b) tried to grab the steering wheel and gear shift, (c) steered the truck into a parked car, or (d) did all or some of these actions.

2. After the crash, when Mulhern pointed his gun at Plaintiff and ordered Plaintiff to put his hands where Mulhern could see them and get on the ground, a jury must determine

---

[6] The Court provides these examples of jury interrogatories only to show that disputed facts need to be resolved before the Court can undertake the qualified immunity analysis. At trial, the actual special interrogatories submitted to the jury will be posed by the parties and approved by the Court, and they will not necessarily be framed as presented here.

15

whether Plaintiff was resisting Mulhern's commands or was confused by Mulhern's commands.

3. When Plaintiff attempted to evade being apprehended by Mulhern at the truck by running away, and then during the ensuing struggle, a jury must determine (a) whether Mulhern shot Plaintiff accidently, which is supported by his statement that the gun "kinda went of[f]," which Mulhern stated at the time of the shooting, and his apparent surprise, whether feigned or not, that Plaintiff had been shot (Docket No. 40-2 at 12), or (b) whether the shooting occurred intentionally as Mulhern stated in his deposition and soon after the incident: "Officer Mulhern pursued the driver and caught him a short distance away, with his gun still drawn. The driver began to fight him again and turned towards him, causing Officer Mulhern to believe the driver was trying to take his gun. Officer Mulhern fired one (1) round to stop the attack. After the round was fired, Officer Mulhern holstered his weapon and continued fighting the driver." (Docket No. 40-13 at 5.)

4. A jury must determine whether Mulhern's view of the "totality of the situation" is credible, as he stated during the investigation, "Officer Mulhern said he did not know if the driver had a weapon, but knew he did not want

to be caught.  He said he was in fear that the driver was going to disarm him and do whatever it took get away when he fired his weapon."  (Docket No. 40-13 at 6.)

5. A jury must assess the credibility of Plaintiff's statement that he has no memory of what occurred between the time he started to run after the crash and when he was on the ground saying he had been shot (Docket No. 36-3 at 32), but that he posed no immediate threat to the public[7] or Mulhern, his "actions were passive and nonviolent," and "at no point did he ever touch Mulhern."[8]

---

[7] Plaintiff testified that he panicked and did not initially pull over because he had an unregistered firearm in the truck. Plaintiff further testified that although he told Mulhern he did not have his driver's license on him, he actually did, but it was in the bag containing the firearm.  Plaintiff testified that he provided Mulhern with his brother's name and he did not provide his real social security number or birth date.  (Docket No. 36-3 at 29.)  Plaintiff further testified that he had been incarcerated several times in various state and county prisons for robbery and other charges, despite telling Mulhern that he had never been arrested or been in jail.  (Docket No. 36-3 at 25-27.)

[8] Plaintiff's brief states, "Plaintiff testified that at no point did he ever touch Officer Mulhern."  (Docket No. 40 at 15.) Plaintiff's deposition testimony provides:

> Q.   And you're saying that prior to running, you don't recall any physical altercation between you and the officer?
> A.   Never touched.
> Q.   He never touched you, you never touched him?
> A.   No.

The resolution of these issues, and perhaps others, will permit this Court to determine: whether the severity of the crime at issue was increased by Plaintiff's actions of lying about his identity and then attempting to flee, or by Mulhern's jumping onto the truck door and the effect, if any, that had on the crash into the parked car;[9] whether Plaintiff's actions posed an immediate threat to the safety of Mulhern and others, or whether Mulhern's actions placed Plaintiff and others in danger;[10] whether it was objectively reasonable for Mulhern to

_____

(Docket No. 36-3 at 31, Page 41, Lines 14-20.)  The video shows that prior to Plaintiff refusing to get on the ground after the crash, Plaintiff and Mulhern never touched.  The video also shows, however, that once Plaintiff refused to get on the ground, Plaintiff and Mulhern did indeed "touch."

[9] See Lamont v. New Jersey, 637 F.3d 177, 184 (3d Cir. 2011) ("Even where an officer is initially justified in using force, he may not continue to use such force after it has become evident that the threat justifying the force has vanished."); id. at 185 ("It has long been the law that an officer may not use deadly force against a suspect unless the officer reasonably believes that the suspect poses a threat of serious bodily injury to the officer or others.  In short, the dispute in this case is about the facts, not the law. The doctrine of qualified immunity is therefore inapposite.").

[10] It was unknown at the time whether anyone was in the parked vehicle the truck rammed when Plaintiff first sought to flee, and it is unclear whether there were any pedestrians in the area.  During the entire encounter, cars in the ordinary course of traffic regularly drove down Alabama Road, which is a rather narrow street, and passed closely by Mulhern and Plaintiff's truck.  One red vehicle passed by after Plaintiff crashed the truck but before he ran, and it stopped a few short feet away.  Its presence appears to have hindered Plaintiff's escape and

draw his weapon in an attempt to apprehend Plaintiff; whether it was possible that Plaintiff was armed; whether it was objectively reasonable for Mulhern to keep the gun unholstered as the foot chase unfolded; and whether it was a proper "split-second judgment" as to the use of force "in circumstances that are tense, uncertain, and rapidly evolving." See Graham, 490 U.S. at 396-97.

Only after this "highly individualized and fact specific" inquiry into the totality of the circumstances confronting Mulhern, Santini v. Fuentes, 795 F.3d 410, 417 (3d Cir. 2015), may the Court determine as a matter of law whether Mulhern's actions were objectively reasonable, and whether the circumstances presented a "clearly established" constitutional right which was violated, so that Mulhern should or should not be afforded the protections of qualified immunity.[11] See James v. New Jersey State Police, 957 F.3d 165, 171-74 (3d Cir. 2020)

---

allow Mulhern to ultimately apprehend Plaintiff. The firing of Mulhern's weapon in close proximity to and even aimed at the innocent occupant or occupants of the stopped car appears to violate the Defendant municipality's deadly force policy as the bullet could have easily struck an innocent third party.

[11] The Court recognizes that it is permitted to exercise discretion in deciding which of the two prongs of the qualified immunity analysis to address first. Pearson v. Callahan, 555 U.S. 223, 236 (2009). In a case involving an allegation of unreasonable use of deadly force, reason dictates first resolving all the relevant historical facts.

(quoting _Ashcroft v. al-Kidd_, 563 U.S. 731, 743 (2011)) ("When properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'").

Consequently, Mulhern's motion for summary judgment must be denied at this time.

### b. Plaintiff's _Monell_ claims

Municipalities and other local government units are among those "persons" to which § 1983 liability applies. _Monell v. New York City Dep't of Social Services_, 436 U.S. 658, 690 (1978). Local governments, however, cannot be held liable for the actions of their employees solely based on the doctrine of _respondeat superior_. _Id._ at 691-95; _Bielevicz v. Dubinon_, 915 F. 2d 845, 849-50 (3d Cir. 1990). In order to successfully state a claim for municipal liability, a plaintiff must allege that the employees' actions were pursuant to a policy or custom of the municipality itself. _Monell_, 436 U.S. at 694; _Watson v. Abington_, 478 F.3d 144, 155 (3d Cir. 2007).

To show the existence of a policy or custom under _Monell_, a plaintiff must allege that the municipality acted or failed to act in any one of three ways. First, the municipality adopted an official policy that deprives citizens of their constitutional rights. _Monell_, 436 U.S. at 694. Second, it tolerated or adopted an unofficial custom that results in the

20

unlawful stripping of constitutional rights.  Natale v. Camden County Correctional Facility, 318 F.3d 575 (3d Cir. 2003). Third, it failed to "train, supervise, or discipline" its employees so as to prevent them from unlawfully depriving citizens of their constitutional rights.  City of Oklahoma v. Tuttle, 471 U.S. 808 (1985).  "A municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'"  Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011) (citation omitted).

Municipal liability under § 1983 must be based on the "execution of a government's policy or custom" that actually results in a constitutional violation.  Smith v. Gransden, 553 F. App'x 173, 178 (3d Cir. 2014) (quoting Monell, 436 U.S. at 694–95).  If no officer committed a "violation in the first place, there can be no derivative municipal claim."  Id. (quoting Mulholland v. Gov't Cnty. of Berks, Pa., 706 F.3d 227, 238 n.15 (3d Cir. 2013); City of L.A. v. Heller, 475 U.S. 796, 799 (1986) ("[I]f the [officer] inflicted no constitutional injury . . ., it is inconceivable that [the city] could be liable . . . .").

Here, because the Court cannot yet determine whether Mulhern violated Plaintiff's constitutional rights, the

assessment of Plaintiff's municipal liability claims against Haddon Township and its police chief may await the outcome of Plaintiff's claims against Mulhern.  These defendants' motion for summary judgment must be denied at this time.[12]

## 2.  Plaintiff's Tort Claims

Plaintiff has asserted several claims against all defendants under New Jersey state law: assault and battery, negligence, and gross negligence.  New Jersey's Tort Claims Act (NJTCA) governs tort claims against public employees.  Under the NJTCA, "A public employee is not liable if he acts in good faith in the execution or enforcement of any law.  Nothing in this section exonerates a public employee from liability for false

---

[12] The Court anticipates a two-phase trial.  In the first phase, a jury will resolve the historical facts by answering special interrogatories so that the Court can determine whether Mulhern is entitled to qualified immunity.  Depending on the outcome of phase one, the Court will then continue to phase two with the same jury to consider Haddon Township's liability, if necessary. The Court has found that bifurcation of the two claims is the proper course because it will ultimately conserve judicial resources and allow the Court a fuller and clearer assessment of the plaintiff's Monell claims after the jury has resolved outstanding factual disputes involving the individual defendant officer's alleged wrongdoing.  See Zampetis v. City of Atlantic City, 1:15-cv-01231-NLH-AMD, 2018 WL 5729905, at *2 (D.N.J. 2018) (discussing Alvarez v. City of Atlantic City, et al., 1:15-cv-02061-NLH-JS, Docket No. 79 (discussing Harrison v. City of Atlantic City, et al., 1:14-cv-06292-NLH-AMD; Norman v. Haddon Township, et al., 1:14-cv-06034-NLH-JS); Taylor v. Ambrifi, et al., 1:15-cv-3280-NLH-KMW, Docket No. 269).

arrest or false imprisonment." N.J.S.A. 59:3-3. The NJTCA strips a public employee of any immunity, however, if that employee is found to have engaged in "willful misconduct." N.J.S.A. 59:3-14(a).

The same "objective reasonableness" standard that is used to determine whether a defendant enjoys qualified immunity from actions brought pursuant to 42 U.S.C. § 1983 is used to determine questions of good faith arising under N.J.S.A. 59:3-3. See Mantz v. Chain, 239 F. Supp. 2d 486, 507-08 (D.N.J. 2002) (citing Lear v. Township of Piscataway, 566 A.2d 557 (N.J. Super. Ct. App. Div. 1989)). Furthermore, willful misconduct is "the commission of a forbidden act with actual (not imputed) knowledge that the act is forbidden . . . . [I]t requires much more than an absence of good faith and much more than negligence." PBA Local No. 38 v. Woodbridge Police Dep't, 832 F. Supp. 808, 830 (D.N.J. 1993) (internal quotations omitted)).

Because the determination of whether Mulhern's actions were objectively reasonable must await a jury's resolution of disputed historical facts, the Court cannot determine whether Mulhern is entitled to "good faith immunity" for Plaintiff's tort claims. This is also true for Plaintiff's tort claims

against Haddon Township. [13]  See N.J.S.A. 59:2-2 ("A public entity is not liable for an injury resulting from an act or omission of a public employee where the public employee is not liable.").  Defendants' motion for summary judgment on Plaintiff's state law tort claims must be denied at this time.[14]

## CONCLUSION

For the reasons expressed above, Defendants' motion for summary judgment on all of Plaintiff's claims must be denied.

An appropriate Order will be entered.

Date: __July 7, 2021__                      __s/ Noel L. Hillman__
At Camden, New Jersey              NOEL L. HILLMAN, U.S.D.J.

---

[13] Police Chief Cavallo was sued in his official capacity. Plaintiff's claims against Cavallo are thus one-and-the-same as his claims against Haddon Township.  Monell, 436 U.S. at 690 n.55 (official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent").

[14] Defendants also argue that Plaintiff's state law claims fail because his injuries do not meet the tort threshold under the NJTCA, N.J.S.A. 59:9-2(d), which provides: "No damages shall be awarded against the public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation on recovery of damages for pain and suffering should not apply in cases of permanent loss of bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $3,600.00."  The Court will consider this argument, if necessary, following the resolution of whether Mulhern is entitled to good faith immunity.